311-0302-7 311-0436 Mr. Zuckerman, may it please the court, my name is Richard Zuckerman, counsel. I represent Jeremy Carter, who is the apollon in this case. I thank you for the opportunity to present this case to you at this time. This case concerns the custody, but more importantly, I think, for our purposes today, the relocation to Colorado of Ava Carter, a three-year-old child born to these parents on September 26, 2008. Now, the parents in this case were never married, but at one time they were engaged to each other and were planning on being married. And I think the chronology of the relationship between Jessica Chenal, who is now Jessica Johnson, and Jeremy Carter is important to an understanding of the issues in this case, particularly the removal issues. Because this was not just a dating relationship, as I think has been stated in the appellee's brief, but this was, in fact, a very long-term involved relationship involving this child. The party started dating in January of 2006, according to the testimony. They began living together initially at one of Jessica's residences in October of 2006. And then in May of 2007, they moved into Jeremy's house in Chillicothe, and at about that time, they became engaged to be married. Now, the marriage did not take place. However, in September of 2008, the child that's at issue in this case, Ava Carter, was born. They lived together from that time with Ava until around October of 2009 when, according to the evidence, they separated. Now, they had separated briefly in either August or September of 2009 and then reconciled. But in October of 2009, they separated for the last time. And in November of 2009, Jeremy began seeing Ava on a regular, consistent basis by the agreement of the parties. And he also began paying support and other financial considerations on the part of the child. No parentage case was filed in this matter until January of 2010. Now, obviously, that's pretty basic. I mean, we have a very large record here. There were a number of days of testimony over a very substantial period of time. But those are the basic facts in regards to the arrangement between Jessica and Jeremy. But the other significant facts in this case which relate to this case, specifically to the removal issue, are the relationship of Jessica with Nate Johnson. And these facts are significant because without this relationship, without her marrying Nate Johnson, obviously, there would be no issue before the trial court. There would be no issue before this court in regards to the removal of the child to Colorado as a result of the petition filed by Jessica for removal. Jessica and Nate met in about November of 2009, according to the testimony. Now, Nate was living in Colorado, working in Colorado. Jessica was here. He had family, a family in Colorado from a prior marriage. Jessica had a child here in addition to Ava from a previous marriage that she was involved in. They saw each other occasionally. I think the testimony was that they may have seen each other monthly. But most of the visits were here in Illinois where Nathan had family. And there were only a couple of visits over the entire time that they were together in Colorado. They became engaged in May of 2010. So we have them meeting in November, getting engaged in May, and then they were married in the Bahamas in August of 2010. In the interim, Jessica, based on the engagement, files her petition for removal of the child. At the time that this case was tried, and it's important to note that that's the time period that was before the court, the parties, I'm sorry, Nathan and Jessica had never lived together as husband and wife for a substantial period of time. With the children, with Ava particularly, but with either all four of the children, the two children from his marriage, or the two children from her marriage and relationship, they had seen each other on an occasional basis. And the testimony was that Ava was not always present for those visits because there were times that she went to Colorado and she was not present. She had not spent much time with Nate's children, nor had she spent much time in Colorado. And I raise all of these points of fact because of the three major decisions made by Judge Dubicki in this case, the denial of joint custody under Section 602.1, which he denied based on the, essentially on the basis that he felt that the parties couldn't cooperate, on the grant of custody to the mother, which he essentially based on her being the primary caretaker, which we disputed both at the trial level and in our briefs, and also on the facilitation of the relationship between the parties and the child, which again we disputed both at the trial level and in our briefs, and the allowance of removal under Section 609. It's the removal decision that will have the greatest impact on Ava because if the court were to reverse the custody issue, obviously that would take care of the removal issue, but it would not really change the relationship between Ava and either of the parents. If the court affirms the custody issue but reverses the removal issue, that will have a substantial impact on Ava's life, as would the affirmance of the removal of Ava to Colorado have a substantial impact on her life. And that's why I'm concentrating mainly in this argument on the removal issue, because I believe that that's the one that has the greatest impact on Ava's life. Okay. Now is the, now under the standard of review, how do we reverse the removal? If you find that based on the evidence that was presented, and again, the record, there was no, the parties, this was a bifurcated trial, judge tried the custody case first. I think that he felt under this court's Taylor decision that because both custody and removal were at issue, that he was required to obviously determine custody first because if he gave the father custody, there'd be no removal issue. The parties had the opportunity to present additional evidence on removal. They did not present any additional evidence. So all of the evidence that was presented was presented on the, at the trial of custody and ultimately the removal case. For this court to reverse the decision of Judge Dubicki, you would have to find that based on the evidence that was presented, and then in our briefs, both in our original brief and reply brief, we talked about the points that were made in regards to why we believe that this case was against the manifest weight of the evidence. You would have to find that it was against the manifest weight of the evidence. And here, it's fairly significant that Judge Dubicki himself, when he starts out his discussion about his decision in this case, says these are difficult cases, this is a close case. So I think for the court to look at the evidence with a new eye, and we weigh the evidence, particularly in light of the points that we made in regards to some of the considerations that we felt were speculative, there was no evidence presented on these issues. For example, the judge used the, relied a lot on, the case centered around the quality of life issue, and how much the child's quality of life would be enhanced by the mother being allowed to reside with her new husband. So ultimately, the decision of this court would have to determine whether or not the judge's, Judge Dubicki's determination that quality of life of the child would be enhanced because the mother's quality of life would be enhanced was enough, with all things being equal, to allow for the removal. And as we pointed out in our brief, there were a number of things that the court, I don't know if you want to say ruminated about, but certainly speculated about. You know, and you know how these things go. Sometimes, sometimes judges write out everything that they're going to say, and sometimes judges look at all the facts that come up to the bench and say, here's my decision, and then start kind of going along and thinking about it as they are making the decision on certain points. Well, I think that's a little bit of what happened here in regards to Judge Dubicki. But, you know, there's speculation in his discussion because there was some evidence about Jessica becoming a stay-at-home mom if she was allowed to move with the child to Colorado because of the new husband's income. There was no evidence presented. He talks about whether or not, he's always wondered whether there were studies about whether or not children do better with stay-at-home moms and that kind of thing, but there's no evidence of that. There was no evidence presented by Jessica in the trial court showing that as a result of her being a stay-at-home mom, in other words, not having to work, that that was going to enhance the child at all. I don't think we can necessarily say that it's kind of, you know, public knowledge that that's going to be better. I don't know that we can say that. So he talks about that. Plus, as we pointed out elsewhere in our brief, essentially the way that she had set up her schedule with Jeremy, when Jeremy was seeing the child on Tuesdays and Thursdays and on the weekends, the way that she had set up her work schedule, she essentially was already a stay-at-home mom. So that was really not going to be an improvement or a change or something that was going to be better for her. That was something she was already doing, and I think that the record bears that out in terms of her own testimony in that she had set up the situation where she was going to be a stay-at-home mom because of the way that her schedule worked and because of the way that Jeremy's schedule for working at Caterpillar worked. So he speculates about stay-at-home moms. And then on the other hand, he speculates about Jessica's future employment in Colorado as a nurse, even though there had been no testimony about the job market, there had been no testimony about when she was going to be, you know, there had been some statement that maybe she might work after the child was in school, but there was no testimony about that. There was some testimony by Mr. Johnson about the school district, which the judge found to be equal with the school districts that were already, that the child would have been in, but that was kind of irrelevant anyway because the child's only three, is not yet in school, so there's really not a school comparison. There was not any comparative presentation of where each of the schools stood in relation to the Colorado schools versus the Chillicothe, Illinois schools. But he speculates about that, and he speculates about whether or not she'll be able to find employment. He also speculates about Nate Johnson's future. Now, there had been some testimony that he, Nate Johnson, would have 20 years in the service. He could retire. He could go into private industry and get a job in private industry. There had been some testimony about that, and the court speculated about that. But Mr. Johnson never testified that that's what he intended to do. He just testified that if he was in the service for 19 years, he would have another year. He'd have 20 years in. There were jobs available. He also testified, as a matter of fact, that if Jessica wasn't allowed to remove Ava to Colorado, then, in fact, he could try and find work in Illinois. But he speculated about that. Well, it's just as much speculation to speculate that Mr. Johnson could stay in the service for another 10 years. So the court speculated about that and used that as part of the justification in regards to the enhancement of the quality of life because Mr. Johnson might retire, might get a job in private industry. But, again, that was not the status of the situation at the time that this case was heard. He was in the service. Thank you. He was subject to being redeployed. He was subject to all of the things that the service are for. So I think, Justice Schmidt, when you ask, ultimately, can you find it in this case, if the decision regarding removal was against the manifest way to the evidence, I think you can, based on what's in the record. I particularly want to direct the court to the sale case, which is on page 43 of my brief, because in that case, the court said simply because a party will be happier living out of state without a spouse in Illinois is not enough to establish that a child's quality of life would be enhanced by that removal. And here, the situation is that that is basically the substance of the judge's decision. Obviously, there were other issues in this case. We would stand on our brief in regards to the issues regarding both the denial of joint custody and the denial of sole custody. I think if the court looks at this case in regards to the mandate of the Eckert case regarding the maximum involvement of both parents with this child, we can see why the removal was not in this child's best interest and that that should be reversed. Thank you, Mr. Zuckerberg. Thank you. Ms. Zaratella. Thank you, Judge. Good morning. Good morning. That pleases the court, counsel. And if your honors would like, I could jump to removal, since I know counsel are focused on it, if you prefer that. Well, it's your argument, but I do have a question. Sure. So how does this meditate? What's the evidence that this child's life would be better and tolerable? Okay. I believe the evidence we put forth, we went through and analyzed that with the factors, and we put evidence forth with that. Number one, this new husband, Nate, overall, big picture, he's a very good guy. Her parents testified about that. She testified about that. He gets along with the kids. But also, he has a very good job out there. He earns approximately $65,000 gross. He testified and my client testified. This will allow her to be a stay-at-home mother. That, to us, is a huge piece of evidence, which would not only improve my client's life, but the child's. What about a 3-year-old child's being able to bond with, in this case, the noncustodial parent? Sure. I believe, obviously, in any removal case, a child's going to be taken away and the other parent's not going to see them. I don't think that destroys any hope of a bond. Is there going to be big distances of time? Absolutely. But that's true in any removal case. That's even true here. The general schedule when they're both in the same town was he saw her alternating weekends and every Tuesday, Thursday for three hours apiece. That wasn't on a daily basis. There would be blocks of time even then, seven, eight days, where he would not see her. And I believe that testimony from my client also was he didn't always consistently exercise that. He exercised a lot of it, but there was blocks of time that he did not exercise even those visits. So I think to say removing the child to be away from father geographically doesn't necessarily mean there's not going to be a bond there because you reward or come back with rewarding him. I think he's got eight weeks during the summer. He's got half of Christmas break. He's got time at Thanksgiving. I believe he also has time in September for the child's birthday. So if she makes friends in Colorado, then gee, eight weeks. She'd pack up and go to Illinois where she doesn't have classmates. Absolutely. And like every other divorce, it's not good for the kid. In every divorce that happens, even when you live nearby each other, they switch households. And here in the factors, correct me if I'm wrong, but your client has two children by two different men, meets her current husband in November. They have a long-term relationship, get engaged in April, and married in August. So in less than ten months after she meets this fellow who lives in Colorado, she marries him. Correct. And now she wants to haul the child to Colorado to live with this fellow who's never really lived with her or lived with him and the two other kids. Correct. And counsel pointed that out, but again, what other evidence other than those facts leads you to believe that that relationship is not a good, healthy relationship between plaintiff and her new husband or between him and her kids? Simply by stating it, those are the facts. But they can't follow up and they didn't elicit any testimony saying that's right, that's just a bad situation and she shouldn't be able to be removed because of that. Nor do we have any case law stating that. Didn't Mr. Johnson testify that he'd be willing to move to Illinois? I believe he said he did testify that he would, meaning that he would do whatever it takes to be with her. He followed that testimony up with, unfortunately, his job. He works in the middle of a mountain and he does basically work with outer space. So it's very specific to that specific area. So I believe he testified that, hey, look, we're married. Counsel, I believe, in trial had asked him if the court were to deny this, what then would you do? Would you consider moving here? And he said yes. And I think that goes more to how much this relationship is genuine. And although it may not meet everyone's criteria for time frame of how long people should wait before they meet someone new and fall in love, this man was willing to, even though he's got two other children in a joint parenting agreement with his first wife, willing to make that sacrifice for her. Well, but, you know, stating these facts, you know, two guys, two kids, meets a guy in Colorado, runs off, marries him, within 10 months of meeting him, would it be an unreasonable inference that the father of this child is a little more stable than your client? The, not Nate Johnson, you're referring to Ava's biological father is more stable? Yeah. If it wasn't for all the facts elicited in this trial, perhaps one could infer that. Unfortunately, I believe the facts based on Ava's biological father in this trial show that he's not any more stable than Nate. Now, we didn't present any mental health evidence. That's not an issue here. But I think the evidence presented in opposing counsel had the opportunity to cross-examine Nate, Nate Johnson, her new husband. And by all extents, there was no evidence presented that there was anything wrong with this gentleman. In fact, it was to the contrary. He had a great job. Her parent, my client and her parents testified that they see him as an honest, loving, caring man, that his relationships with the children, both Ava and Cesar, was very genuine. They observed nothing, you know, wrong with that. I believe the testimony of Ava's father that came out on cross-examination by me was that he seems to have a problem controlling himself at these exchanges of visitations. He has a problem in front of Ava, the child, calling my client's names, calling her an effing whore, calling my client's sister-in-law a C-U-N-T in public. I think his actions, I think, came out that he doesn't seem to be very stable. And when I say stable, I'm certainly not accusing him in the mental health arena. I'm simply saying he doesn't seem to have his emotions under check, if you will. Well, wouldn't it be evidential that your client did some things to maybe push some buttons, like bring her new boyfriend to the exchanges and things like that? Aren't those calculated to stick a finger in his eye? I think that that's what they're arguing by, but I believe the testimony was they both brought witnesses. And when he threatened to get a restraining order on my client's husband, I believe they were married at that point. So this is now her husband, and he's not accepting that. To further that, at one of the exchanges, and this was in November, so we've gone almost a full year, the grandparents went to pick Ava, my client's parents. They were simply wearing, the father was wearing a jacket that had the Air Force insignia on it. And this put the father in an outrage. He opened up the door and looked at the child in one hand and the video camera in the other. Now, again, if there was no child witnessing this, you could chalk this up to hurt feelings. Perhaps one party's not over the other, but remember, this is all happening in front of Ava, the child. She's only two at this point, about to be three, or I believe just turned three in September. But a kid's going to remember this type of stuff, and I think that's very concerning here. This person has had a full year to get over this relationship with the mother of Ava, and he hasn't done it. In fact, it's gotten worse by the testimony of both parties. When we broke at one trial and came back to wrap it up, we all presented more evidence of how bad these exchanges have gotten. One of the exchanges in October of 2010, my client testified, and it was not rebutted by the father, that the father pulled up in the driveway, Ava had a hat and gloves on and whatnot because it was October, that he pulled Ava out of the car and tore this coat off, tore the gloves off. Ava started crying and said to Ava, well, this is the way your mom wants it. You know, we can't share clothes. Again, this is not the behavior that he should be exhibiting in front of the child ever, let alone almost a year after she met her person she ended up marrying. So it would seem to me that the cause of concern there is he is just as heated and just as bothered and just as upset as he was an entire year ago and has not moved forward. And I think it would be argued he's actually moved back. I think that is why removal in this situation is in the best interest. You have people that testified. Here's two people that were married. They each have kids. They each get along with their prior husband and wife. I think that's very telling. They both testified. They have great communication with them. They're co-parenting their other kids. I think that shows these people have been through it and are capable of doing that. They testified, Nate and my client testified, that they'll be living in a very nice neighborhood, family-oriented, five bedrooms, three baths. They've got parks, a school nearby, hospitals. I thought it was a lovely area. I know Counselor suggested, well, why didn't we bring in, basically, why didn't we have an expert to testify about the schools? We didn't do that. We didn't bring in an expert. She just testified from a layperson experience, and I believe Nate did too, the new husband, Nate Johnson. They looked it up on the Internet, and that originally when Nate purchased his house, because he's got two little boys, he looked at the schools and where they rank. And I think in cases like this, experts are expensive. So if you're on a budget and you're already paying for your attorney, you're going to Google the neighborhood and find out how the schools rank, and I don't think people will necessarily bring in an expert for that. Okay, so it's a nice school. As far as improvement, what about Chillicothe? It's not a horrible place to raise a kid, is it? No, and I don't think my client ever stated that, and I think Chillicothe can be a great place to raise a child. We never said it wasn't, but what we're saying is when you put the school along with the rest of the evidence of why it would be in the best interest, that's just one factor that goes in a pile, that we believe Colorado was in the best interest because Mom was going to be able to remarry. She's going to be able to live in the same household with her husband. She's going to be able to have the camaraderie of the military, which Taylor brings up. She's going to be able to spend more time with Ava and Cesar because she does not have to work. She's got a bigger house. Ava will have more room to run around. She's got siblings, two more siblings that I believe the testimony showed that those siblings all get along. Am I too frequent, as you pointed out earlier, Your Honor? No, these people were not able to spend a lot of time together because he had to travel at the expense of Colorado, and they both have kids. But the time they did spend together, they both testified it was great, you know, that the kids all got along, that going to the airport was difficult. I think they showed there was a genuine loving bond formed between both of these families. And I think that in and of itself is a good reason to allow removal. But isn't the fact that she chose to marry someone out of state before the court, before it was determined whether she was going to be able to live out of state, isn't that sort of, you know, putting the cart before the horse, saying, well, you know, it's in her best interest because now she'll get to live with her husband. But she made that choice knowing maybe this wasn't going to be allowed by the court. So is it fair to say that's something now that works in her favor? She went ahead and did it when she knew maybe she wasn't going to be able to stay there with him. And so now to say, oh, she'll get to be with her husband, so, you know, it really is a factor that weighs in their favor. It seems to me to be a little bit maybe disingenuous in that I don't know if you can use the reason for this petition as, in that term, something that's really only benefits the mom in terms of the child's relationship with her mother and her biological father. It's remarriage. I guess I don't see how it really benefits Ava to be taken from everything she knows, even if it is a happy situation, without something, which you told me so far,  I haven't heard, you know, I know she's going to have two more days with this child where she can stay home. And there's, you know, studies and evidence that shows maybe children should be more socialized than five straight days with mom. So I don't know if that's good or bad. But I don't see a big smoking gun other than the mom chose to get married without knowing that she's going to be able to move. And, again, that's one factor. Just in Taylor, a lot of these cases, that's what happens. Because these people, this trial was dragged on for almost a year. And I think they felt, why wait? And, again, we would have to sit here today and speculate what she would have done if the judge, what her and her new husband would have done if the judge ruled against them. When was the removal petition? The removal petition was filed after the original parenting petition. And weren't those filed after the marriage? No, they were married while the parenting petition, I believe Counselor just indicated, and I apologize, I don't have it in me, January. They weren't married until that summer. I think it was August of 2010. But the parentage action, my understanding was that ended and then the custody, so the custody. Correct. They were filed a few months apart, but they were tried basically together. So it wasn't as though we tried the whole custody, then got the court order, then filed it. That's not how it went. Procedurally it went. We filed the parenting petition in January of 2010. A few months later, we filed the removal. We had no trials at that point. So the petitions all got on file. The first hearing we were at, the courts asked Counsel and I, the trial counsel, how do you folks want to do it? We said we are going to present the same evidence. We'd rather try it all together, meaning we'll put forth everything. So we started to do that. Then we ran out of time and had to keep getting new dates. I'll clear it to you. Thank you. We had to keep getting new dates. Then at the last, the judge, Judge Dubicki, basically said once you ruled on custody, I'm going to give you guys an opportunity to present anything else for removal if you want. Neither Counselor and I did, because we had presented everything already, based on what the court had said at the very beginning around opening statements. But as far as what Your Honor had stated, we certainly don't believe it is equal. We don't believe if she were, first of all, the difference in the facts put forth is, again, no, we don't have an expert saying a stay-at-home mom and her being able to stay-at-home mom is going to be better. But they didn't bring in an expert either saying it's not. And I think he's oversimplifying, Counselor's oversimplifying it when he says, well, she's only going to get two extra days. Well, no, she's not. He saw Ava for three hours every Tuesday and Thursday. That's six hours in alternating weekends. So she's now no longer working, my client. She will have Ava with her 24-7. Ava's not in school except for the breaks when she goes to visit her father. So I believe that's a misstatement by Counsel to argue, well, there's not going to be a difference there. She won't be able to see her as much or more. And I believe in our brief under the section of removal we did outline the factors of why we believe it was in the best interest. And we agree with the judge ruling that it was in the best interest to allow her to move. We believe we put forth facts under Collin, Warren, Eckhardt, Eaton, Taylor, and all of those cases to indicate that this was, in fact, in the best interest. And Taylor is the court from the case the judge relied on to say the court ought to give the mom or whoever has sole custody some deference here if they decide removal is in the child's best interest. And I think that's what the judge did here, and we would agree with that. Well, let me, well, there's like six trips he's got planned back under this visitation agreement. So either Ava's going to jump on a plane 12 times a year back to Illinois, or she's going to take a 15-hour car ride 12 times a year. Mm-hmm. Does that sound like fun to you? Well, no, it doesn't, and I'm glad I'm not Ava. But I would also be happy if I was Ava and in Colorado with my mom. So as far as that goes, I don't think when you have divorce or a case where people are not married and this house is broken from the get-go, there's never going to be a great outcome. There's always going to be traveling, whether in the same city, traveling in the same state, or traveling on a plane. It's just part of getting divorced or part of having your parents never been married. Thank you very much. Thank you. Thank you. Thank you. Mr. Zucker, maybe some rebuttal. Thank you, Your Honor. I'll keep it short. Justice O'Brien, the petition for removal was filed on June 15th, so it would have been after the engagement in May but before the marriage in August of 2010. And about five months after the initial petition for determination of parentage was involved. I do want to, I think what you were pointing to, Justice O'Brien, was a self-fulfilling prophecy. By getting married, by establishing that situation where she was with this gentleman in Colorado, she created a situation where she would have to ask the court for leave to move to Colorado. Now, we never alleged, and I don't think it was our, and I didn't do the trial, but I don't think it was alleged in the trial court, nor did Judge Dubicki find that the motives of either party in this case under 609, under the Eckert-McCauley board dichotomy, that either party had ill motives. But it almost sounds like when you hear the Appellee's counsel, it sounds like she had a lot of reasons why she would want to get out of Illinois. But the court didn't find that. We didn't allege that. It's just that as I was listening to the argument here, it did sound like she had reasons why it would be for her and her best interest to move herself out of Illinois even more than moving the child. I think that, I did want to correct a couple of things. It was admitted, part of the exhibits admitted in evidence were calendars that Jeremy kept of all of his time with Ava. And I think if the court reviews those calendars as part of the record in this case, the court's going to find that unlike what Ms. Serratella said in regards to my client missing visitation, in fact, he had additional visitation by agreement, but additional time with the child over and above the two days a week and the alternate weekends. He had time at Christmas. He had time a week here or there. There was additional time that he had over it. So it wasn't just those two days per week, and it wasn't just those alternate weekends. Plus, since they never got to the issue as this was an initial proceeding, not a modification, which is usually the way these cases arise, they never got to the determination of what his basic parenting time would have been with the child. So we never established what his summer would have been, what his alternate holidays would have been, what his Christmas or springtime would have been with the child. Because they were operating, at least until January of 2011, they were operating under an oral agreement. It wasn't even a court order until January 2011 as to what the parenting time would be. So I think that this case is different. This is not a disaffected dad who says, I want to keep my kid here to get back at the mom. I think that the record is clear from the testimony from all parties that my client was involved and invested in this child. And as Justice Schmidt has pointed out, not only are those trips going to be numerous for Ava, but they're going to be expensive. And if the court looks at my client's finances, looks at what he's been ordered to pay in addition to the basic child support, that's going to be very difficult for him to even use all of that visitation just because of the cost and the distance involved. So I think when the court looks at all of those factors, it really does have to determine whether or not the quality of life of the child was enhanced in this case by allowing the removal of the child to Colorado. So unless there's any additional questions. Thank you. Thank you, Mr. Zuckerman. Ms. Sartella, thank you also. And this matter will be taken under advisement and a written disposition will be issued. Right now, the court will be in a brief recess for a panel chance.